IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SCOTT CROCKETT, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No.: _15-cv-9266_ |
| vs. | ) ) | |
| BMW of NORTH AMERICA, LLC. | ) ) | |
| Defendants. | ) ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Scott Crockett brings this action against BMW of North America, LLC ("BMW") individually and on behalf of all others similarly situated, as more specifically described below, who purchased or leased BMW automobiles containing the N63B44O0 ("N63") model engine. BMWs containing the N63 engine are defective, breach BMW's express and implied warranties, and were deceptively marketed and sold to consumers.

## INTRODUCTION

1.      In 2008, BMW introduced a new V8, twin-turbocharged engine, which the company and enthusiasts refer to as the "N63." This large, high-performance engine was designed to be BMW's next generation V8 and was placed in certain 5 Series, 6 Series, 7 Series, X5, and X6 vehicles from 2008 until 2013 model years.

2.      The N63 engine was defectively designed and/or manufactured, which has caused vehicles containing this engine to suffer from three serious defects—the Burning Oil Defect, the Engine Quality Defect, and the Battery Defect—contrary to the terms of BMW's New Vehicle Warranty and the implied warranty of merchantability.

3.      *First*, N63 vehicles suffer from a Burning Oil Defect.  This defect causes the N63 engine to burn off and consume excessive amounts of oil between regularly scheduled service visits.  In fact, Consumer Reports recently published a study on excessive oil consumption, which compiled complaints regarding nearly 500,000 individual vehicles.  The study concluded that BMWs models that contained the N63 engine made up four of the five worst performers, including the worst performer on the list, the BMW 5 Series (V8). This vehicle consumes excessive amounts of oil 27 times more often than the average vehicle.

| RANK | MAKE & MODEL | % OF VEHICLES THAT NEEDED AT LEAST A QUART OF OIL BETWEEN CHANGES | | | | |
|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 |
| 1 | BMW 5 Series (V8) | * | 43 | 33 | 36 | 15 |
| 2 | BMW 7 Series | 38 | 34 | 35 | 37 | 11 |
| 3 | BMW 6 Series | 18 | – | 18 | 38 | 11 |
| 4 | Porsche Panamera | 61 | 39 | 20 | 22 | 5 |
| 5 | BMW X5 (V8) | * | 29 | 23 | 10 | 11 |
| 6 | Audi A4 (2.0T) | 58 | 48 | 9 | 4 | 2 |
| 7 | Audi A5 | 52 | 34 | 10 | 3 | 2 |
| 8 | Audi Q5 (2.0T) | 24 | 55 | 11 | 7 | 0 |
| 9 | Porsche Cayenne | 26 | 23 | 21 | 7 | 2 |
| 10 | Audi A6 (V6) | 20 | 17 | 22 | 3 | 2 |

(http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm).

4.      *Second*, N63 vehicles suffer from an Engine Quality Defect.  This defect, often blamed on excess heat as a result of the uniquely compact engine design, causes several engine components to prematurely fail, which requires extensive replacements and repairs.  One recent article, entitled *BMW 4.4-liter N63 Engine Experiencing Frequent Reliability Problems*, describes the engine as "a bomb on wheels." (http://www.autoevolution.com/news/bmw-44-liter-n63-engine-experiencing-frequent-reliability-problems-88225.html).

5.      *Third*, N63 vehicles also suffer from a Battery Defect. As described in a recent Road and Track article, *Enginerdy: Why BMW's N63 twin-turbo V8 eats batteries,* the N63 damages the vehicles' electrical systems and causes excessive battery strain, which in turn

requires frequent battery replacement.  The Battery Defect is such a serious problem that BMW now instructs its service representatives to replace the battery in N63 vehicles at *every oil change*.  This defect will cost N63 owners thousands of dollars over the lives of their vehicles and will impair the resale value of every N63 vehicle.  (http://www.roadandtrack.com/car-culture/buying-maintenance/a25710/enginerdy-strange-connections-bmw-n63-v8/).

## I.   PARTIES

6.    Plaintiff, Scott Crockett, is a Missouri resident who lives in the Village of Loch Lloyd, Cass County, Missouri.  In May 2013, Crockett purchased a brand-new 2013 BMW X5 xDrive50i SUV, containing a 4.4-liter twin-turbocharged V8 engine, model N63B44O0, from Baron BMW in Merriam, Kansas.

7.    Defendant, BMW of North America, LLC is organized under the laws of Delaware with its principal place of business located at 300 Chestnut Ridge Road, Woodcliff, New Jersey.  BMW of North America was created in 1975 to act as the United States importer of BMW luxury and performance vehicles, which were traditionally manufactured in Munich, Germany.  The company sells vehicles through 338 independently-owned dealerships across the United States.   At all relevant times, BMW was engaged in the business of importing, assembling, marketing, distributing, and warranting BMW automobiles in the State of Kansas and throughout the United States.

## II.   JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because Plaintiff and Defendant are citizens of different states and because, upon information and belief, the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest.

9.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff presents a claim under the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*.

10.     The Court has personal jurisdiction over Defendant because Defendant maintains systematic and continuous business activities in the State of Kansas and because Defendant intentionally avails itself of Kansas consumers.

11.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Plaintiff purchased his vehicle from Baron BMW in Merriam, Kansas.  A substantial part of the acts or omissions giving rise to Plaintiff's claims therefore occurred within this District.

### III.    FACTUAL ALLEGATIONS

### The N63 Engine

12.     The BMW N63B44O0 is a twin turbo, direct-injected V8 engine included on certain BMW vehicles from 2008 to 2013.   Upon information and belief, the N63 engine was included on the following BMW vehicles ("Class Vehicles") for the model years shown below, as indicated by "50i" appearing at the end of the full model description:

> BMW X5 xDrive50i (2011-13);
> BMW X6 xDrive50i (2008-2013);
> BMW 550i (i.e. "5 Series") (2011-13);
> BMW 650i (2011-12); and
> BMW 750i (2011-12).

13.     The N63 engine was specifically included in the "xDrive50i" version of BMW's X5 SUV, which is the vehicle purchased and owned by Plaintiff Scott Crockett.

14.     The N63 has become widely known and described as defective throughout the automotive industry and the BMW-enthusiast community.  It is widely recognized that N63 engines burn excessive amounts of oil, require frequent engine repairs, and cause the need for

excessively frequent battery replacements, especially as compared to other, similar vehicles not containing N63 engines.

<u>**The Burning Oil Defect**</u>

15.     N63 vehicles are notorious for burning excessive amounts of oil and frequently need additional quarts of oil between scheduled changes to prevent catastrophic engine damage or failure.

16.     The Burning Oil Defect was particularly apparent in a recent Consumer Reports study on excessive oil consumption.  Consumer Reports studied 498,900 vehicles across several makes and models for complaints about oil consumption and concluded that BMW's N63 engine was    included    on    four    out    of    the    five    most    defective    vehicles. (http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm) Consumer Reports released the following list of worst performers:

| RANK | MAKE & MODEL | % OF VEHICLES THAT NEEDED AT LEAST A QUART OF OIL BETWEEN CHANGES | | | | |
|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 |
| 1 | BMW 5 Series (V8) | * | 43 | 33 | 36 | 15 |
| 2 | BMW 7 Series | 38 | 34 | 35 | 37 | 11 |
| 3 | BMW 6 Series | 18 | – | 18 | 38 | 11 |
| 4 | Porsche Panamera | 61 | 39 | 20 | 22 | 5 |
| 5 | BMW X5 (V8) | * | 29 | 23 | 10 | 11 |
| 6 | Audi A4 (2.0T) | 58 | 48 | 9 | 4 | 2 |
| 7 | Audi A5 | 52 | 34 | 10 | 3 | 2 |
| 8 | Audi Q5 (2.0T) | 24 | 55 | 11 | 7 | 0 |
| 9 | Porsche Cayenne | 26 | 23 | 21 | 7 | 2 |
| 10 | Audi A6 (V6) | 20 | 17 | 22 | 3 | 2 |
| 11 | Audi S4 | 37 | 19 | 11 | 3 | 0 |
| 12 | Audi A3 (2.0T) | 9 | 13 | 11 | 6 | – |
| 13 | Subaru Outback (6-cyl.) | 14 | 17 | 13 | 3 | 2 |
| 14 | Audi S5 | 26 | 11 | 8 | 4 | 1 |
| 15 | Audi Q7 | 10 | 7 | 15 | 5 | 3 |
| 16 | BMW X1 (6-cyl.) | – | – | – | 7 | 2 |
| 17 | Subaru Legacy (6-cyl.) | 19 | 15 | 13 | 2 | 0 |
| 18 | BMW 335i Sedan | 8 | 5 | 9 | 9 | 3 |
| 19 | Audi A7 (V6) | – | – | 17 | 3 | 0 |
| 20 | BMW 5 Series (6-cyl.) | 8 | 8 | 8 | 8 | 2 |

17.     As shown, the V8 version of the BMW 5 Series, which contained the N63 engine in 2011, 2012, and 2013 model years, was the worst performer in the study with 43% of vehicles needing an additional quart of oil between changes as of 2015.  BMW's 6 Series and 7 Series,

many of which contained the N63 engine, are the next worst performers.  Finally, the V8 version of the X5, which was the model purchased by Plaintiff, was the fifth worst performer in the study.

18.     The table also shows that a greater percentage of defective models start to burn oil as they age.  This means that large numbers of N63 owners will begin to experience the Burning Oil Defect over the next couple years.

19.     The Consumer Report article also included the following chart, which shows the percentage of all surveyed vehicles that needed at least a quart of oil added between changes (not the result of an oil leak), sorted by model year.



20.     As shown, approximately 2% of surveyed 2011 vehicles reported needing an extra quart of oil added between oil changes.  In contrast, 43% of 2011 BMW 5 Series V8s, which all contain the N63 engine, needed extra oil.  As a whole, only 2% of the 2010-14 vehicles included in the study required extra oil.  However, BMW's 5 Series (V8) led to 27 times more complaints about oil consumption than the average vehicle.

21.     Many purchasers of vehicles containing the N63 engine have become upset about the excessive oil consumption – which is typically not disclosed by BMW in the product literature – and have posted internet complaints about specific frustrations and hassles caused by the Burning Oil Defect.

22.     For example, one N63 purchaser started a thread entitled "Excessive oil consumption" on a BMW enthusiast website in November 2011:

> So I'm starting to get a little irritated at how much oil my 550 is burning.  In the last 6k I've had to add 1 quart of oil three times.  In other words it is burning a quart every 2,000 miles.  I've read some people posting about having to add oil before but this much??  I've never owned a new car that burned any oil much less at this rate.  Anyone else having this issue?  Oh btw the car has 9120 miles and I put 3100 in Europe during my ED.  When I was to have redelivery I had the dealer do an oil change and was gonna change the oil every 7.5k.

(http://www.bimmerfest.com/forums/showthread.php?t=581072).

23.     A fellow BMW enthusiast responded with four separate links about the oil consumption issue and explained that the defect "was a hot topic back in September" of 2011. (*Id.*)

24.     One N63 owner replied: "Looks like I've got a real oil burner.  I'm getting the low warning again.  So for me, September delivery.  Added oil in November, February, and now April."  (*Id.*)

25.     Another N63 owner explained that his vehicle frequently gave off the smell of burnt oil: "For those burning through oil, do you notice a burnt oil smell at all? My 550 required one quart maybe 6 months ago, then the annual oil change brought the level up to the top.  A few months later the oil level now reads half."

(http://www.bimmerfest.com/forums/showthread.php?t=581072&page=2).

26.    The Burning Oil Defect became so problematic that in 2013 BMW took the extraordinary step of changing service specifications – in a service bulletin issued to BMW dealers and service providers – regarding the N63's oil consumption, instructing dealers to add two quarts of oil to N63 vehicles when the vehicle's own instruction to owners is to add one quart of oil.  Specifically, BMW released service bulletin SI B 11 01 13 in June 2013, which upon information and belief reads as follows:

> **Subject: N63 and N63T Engine: Engine Oil Consumption, Engine Oil Top-ups and Refill Capacity**
> MODEL
> F01 F02 F06 F07 F10 F12 F13 E70 E71
>
> **Customers with one of the vehicles above may complain that the engine's oil consumption is "too high," resulting in engine oil top-ups and workshop visits to address the issue before the vehicle displays an engine oil service as being "due."**  When the vehicle's engine oil drops to the minimum level, a message will display in the vehicle advising the driver to "add 1 quart of engine oil."  After topping up and continued operation, the "add engine oil" message may display again before an engine oil service is required and performed.
>
> **Cause:**
> **Engines that are fitted with a turbocharger, as part of their normal operation, will consume engine oil at a higher rate than a naturally aspirated engine (non-turbocharged engine). In this case, a "turbocharged" engine could require topping up of the engine oil more frequently.**
>
> **Procedure:**
> Engine oil - Topping up
> **When one of the above vehicles displays a message to add 1 quart of engine oil, BMW recommends adding 2 quarts of engine oil instead.** The engine's oil sump design allows the additional quart; the result is a total capacity of 9.5 quarts (9.0 liters) of engine oil.
>
> **Engine oil:**
> Maintenance services and engine repairs
> When performing all future engine oil maintenance services and repairs that require draining and refilling the engine oil, the new recommended refill specification is 9.5 quarts (9.0 liters) of engine oil.
> . . .

(*See e.g.*, http://www.xbimmers.com/forums/showthread.php?p=14449679 ) (emphasis added).

8

27.     As shown, instead of addressing the underlying cause of excessive consumption of oil in order to attempt to fix that defect, BMW recommended that its service technicians simply add more oil to respond to consumer complaints.  Technicians were instructed to add two quarts of oil when the vehicles electronic system called for one additional quart and to also add an additional quart as the default fill on N63 vehicles.  While BMW did not address the underlying problem, it likely reduced the number of complaints because all class vehicles now had extra oil to burn off before the next service visit.

28.     The validity of this service bulletin (which, upon information and belief, BMW did not release to the public) is confirmed by dozens of internet posts that convey a similar understanding from BMW service professionals.  One N63 owner posted a dealer's explanation of the oil consumption issue on May 7, 2013:

> **So I go back in to the dealer for my monthly oil top-off** and my SA tells me they got new oil specs from BMW that tell them to add more oil to the V8 engines than the 1 qt that the car tells you to add.  IAW when it tells you to add 1 qt, add 2 qts.  And, when you come in for the 45K oil change, they'll add 1 more qt than normal.

(http://www.bimmerfest.com/forums/showthread.php?t=581072&page=3) (emphasis added).

29.     Technical Service Bulletin SI B11 01 13 appears to be part of a campaign to conceal the Burning Oil Defect and instead describe it as a normal feature on turbocharged vehicles.  Many N63 purchasers and automobile consumer advocates disagree that this level of oil consumption is normal and instead believe that it is excessive and well beyond normal.

30.     Consumer Reports offered its opinion of excessive oil consumption in the subtitle of its article: *Excessive oil consumption isn't normal: Automakers say adding oil between scheduled changes is acceptable. It's not*.

(http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm).

31.     Many N63 purchasers share similar sentiments.  For instance, one N63 owner responded to the service bulletin with the following post on June 26, 2013:

> I'be [sic] had to add oil at 2500 mile intervals with 5600 miles on car now. **Called bmw USA and they said they are well aware [of] the issue and it is due to the high operating temp of the v8.** Huh?  Owned plenty of v8's in the past and rarely ever added oil. **This thing is burning more oil than my parents old Chevys with 150k plus miles on them.** How much will these bad boys burn with 100k on the odometer?  Not a big deal, just annoying.

(http://www.bimmerfest.com/forums/showthread.php?t=581072&page=3) (emphasis added).

32.     An internet search of "N63 and Burning Oil" reveals thousands of similar complaints about the Burning Oil Defect.

33.     The Burning Oil Defect can be enormously consequential to N63 owners and deprives N63 purchasers of their original bargains.  First, excessive oil consumption requires additional service visits, which many N63 purchasers specifically sought to avoid by purchasing high-end BMW vehicles.  Second, the Burning Oil Defect means that N63 owners have to worry about obtaining BMW-approved oil when needed.  If owners continue to drive without adding oil, their vehicles might catastrophically fail and strand them or potentially cause a life-threatening accident.  This discourages many owners from traveling long distances in their N63 vehicles.  Third, N63 owners will suffer significant loss when they sell because the reputation of these vehicles has been impaired by now-public research establishing that these vehicles suffer from the Burning Oil Defect.

**The Engine Quality Defect**

34.     The N63 also suffers from a broader Engine Quality Defect, which causes several engine components to prematurely fail and necessitates frequent, costly repairs and replacements.

35.     One automotive website recently summarized the N63's Engine Quality Defect in an article "*BMW 4.4-liter N63 Engine Experiencing Frequent Reliability Problems*".  It concludes that, **"[t]he N63B44O0 4.4-liter twin-turbo V8 is a bomb on wheels**" and relays that the author recently interviewed a BMW mechanic who has changed at least a dozen N63s because of faulty injectors or faulty high pressure fuel pumps.

(http://www.autoevolution.com/news/bmw-44-liter-n63-engine-experiencing-frequent-reliability-problems-88225.html).[1]

36.     The article offered one explanation of the Engine Quality Defect:

It seems like the injectors would shoot too much petrol inside the cylinder which would in turn cause some shrapnel to come off that would eventually get stuck in all sorts of places and cause the piston to crack the case.  Basically, you'd be in for a surprise when a rod or even a piston would shoot through the engine block.

(*Id.*).

37.     It also includes the following picture, which appears to be a N63 engine with a large gash in the engine block, likely caused by a broken piece of metal flying through the motor:



(*Id.*)

---

[1] The article is incorrect that the N63 was discontinued for all 2013 models.  BMW did not discontinue the N63 on 2013 X5, X6, and 5 Series vehicles.

38.     The Engine Quality Defect most often forces N63 purchasers to replace their vehicles' fuel injectors and fuel pumps.

39.     One N63 owner expressed his frustration at persistent fuel injectors failures and replacements in a "Fuel Injectors in N63 engine" thread:

> Sorry to bring this to issue if it has been started before.  But I have a 40k model 550i GT, (2010) with fuel injector problems.  **Every oil change (not just adding oil) reveals a need to change at least one bank of injectors.**  At first (I bought the car with 23k miles from a dealer), the issue was the fuel I was using. BMW dealer gave me a handout with the list of "approved" premium fuel manufacturers and I've stuck to that.  This occurred at about 32k miles.  I was just wandering if this is common to that engine.  **If it is I would definitely consider getting rid of this car before the warranty runs out in November this year.  I costs [sic] between $600-$800 each time to have this done, if I were to have to pay for it myself.** . . .

(http://www.bimmerfest.com/forums/showthread.php?t=765990) (emphasis added).

40.     Another owner expressed similar frustration:

> [W]ow, this is beyond ridiculous. all the horror stories make me feel like i'll be moving onto the new s-class benz when i'm done with this car. this is becoming too much and way too consistent that i'm seeing all these severe, chronic issues with these "brand new" bimmers.

(http://www.bimmerfest.com/forums/showthread.php?t=805414)

41.     One N63 X5 purchaser complained about his 2012 vehicle in a "Injector replacement 2012 X5 50i" thread back in February 2013:

> I've had a check engine light pop up this week so I took my X5 in for service. I've had some roughh [sic] idle and [] have noticed more black soot on the exhaust surrounds.  They are telling me that they found the injectors are the problem and are replacing them.  Has anyone else had this?  Seems kind of odd to me.  I have only had this X5 since last March, although it does have 20k miles on it.

(http://www.xbimmers.com/forums/showthread.php?t=805582).

42.     Another N63 purchaser responded:

Yep, very common problem for the N63.  BMW has had multiple part number revisions trying to sort out the problem, but no dice yet.  On the 550i, 650i, 750i, and X5 50i, it's the same issue … this engine is plagued.

. . .

(*Id.*)

43.    Another apparent N63 purchaser responded with a recent experience:

I was driving my 2012 X5 on I-65 yesterday on my way back from Birmingham to Mobile.  I was about 30 miles from home, doing about 80 when I passed a truck and got back in the right lane. **Just as I got over, the engine malfunction warning came on and my speed went from 80 to 45 in about 1/2 second! Scared the daylights out of me and my 9 year old.  The truck I just passed had to swerve to keep from hitting me.**  I pulled right off and called my husband.  He told me to turn engine off and restart.  Didn't work first time but I did it again for about 10 minutes and it restarted and acted normal.  I took back roads home as to avoid a very long and extremely tall bridge just before Mobile.  Took it to BMW today and they said there were two faulty fuel injectors and had to order new ones.  Has anyone heard of such drastic reduction in speed and what are the chances the other injectors may fail later?

(http://www.xbimmers.com/forums/showthread.php?t=805582&page=3) (emphasis added).

44.    A BMW enthusiast replied to this story a couple hours later:  "^A very good chance. There's something inherently wrong with the fuel or ignition system on the N63 and probably the S63 as well." (*Id.*)

45.    One potential N63 purchaser (Navy21) asked for advice in another thread: "Found a nicely equipped CPO 2011 x5 50i.  Low mileage but the service records show that all 8 fuel injectors have been replaced. Am I correct to assume this 'should' make the car 'safe' from a purchase standpoint."  (http://www.bimmerfest.com/forums/showthread.php?t=713891).

46.    Another BMW enthusiast responded:

Navy, do not buy it.  If you have reservations there's a reason.  The fact that BMW is screwing it's owners by not even issuing a recall is a joke.  There's a reason Mercs and Audis are pulling up the rear fast on BMW…… same amount of fun, less problems.

(*Id.*).

47.     Owners and enthusiasts often blame both the Burning Oil and Engine Quality Defects on BMW's decision to place the N63's twin-turbochargers inside the engine V, instead of outside the engine V, where turbochargers are typically located.  This atypical placement stacks engine components on top of each other, which means the engine cannot properly dissipate heat, which in turn causes the premature failure of surrounding components.

48.     This theory is supported by various sources.  For instance, one BMW enthusiast started a thread, *The Design Flaw in N63 Engine*, which summarizes a Russian-language article that "describes the problem with N63 engines, in particular the very high temperature of 900 Celsius in the engine bay and how it screws up nearby components. . . ." (http://www.bimmerfest.com/forums/showthread.php?t=820378).

49.     Another poster agreed with this Russian-language diagnosis and complained:

> This was NOT difficult to discern.  We have talked about opening the hood to cool off this incinerator of an engine ESPECIALLY during Summer months here in Texas!  It is most unfortunate they/BMW didn't take all the heat considerations that was OBVIOUS with a "Twin Turbo V8" for goodness sakes! . . . .

(http://www.bimmerfest.com/forums/showthread.php?t=820378&page=2).

50.     To address these pervasive engine quality issues, upon information and belief, BMW offered some select purchasers limited remedies, but forced them to sign non-disclosure agreements to prevent other N63 owners from learning that their vehicles are defective.

51.     A consumer explained recent developments regarding his defective N63 vehicle:

> As an update to my May complaints about faulty fuel injectors and cam shaft issues, **BMW corporate has finally agreed to take me out of this 2013 X5 5.0 M sport package and offer a specific "customer retention" program to get me to stay loyal to BMW after selling me a defective car. That's all I can say.** To all those who are having fuel injector and other acceleration and engine issues at low mileage, I strongly recommend opening a file with BMW Corporate

Customer Service.  They will not recall their vehicles but if you tell them you are dumping a BMW for a Mercedes, you will get some pretty decent treatment

(http://www.bimmerfest.com/forums/showthread.php?t=713891&page=2) (emphasis added).

## The N63 Customer Care Package

52.     Following hundreds of customer complaints about the Burning Oil Defect and the Engine Quality Defect, BMW launched the "N63 Customer Care Package" (bulletin B001314) on December 29, 2014.  The Customer Care Package consisted of several different measures, which merely mask or only partially mitigate, but do not correct, the serious design and/or manufacturing defects of the N63 engine.

53.     *First*, the Care Package instructed service representatives to check each covered vehicles' timing chain, fuel injectors, mass air flow sensors, crankcase vent lines, battery, engine vacuum pump, and low pressure fuel sensor, and replace if necessary.  BMW instructed its service representatives to inspect and replace these components for free, even if no longer covered by the manufacturer's standard 4 year/50,000 mile warranty.

54.     *Second*, BMW reduced the recommended oil change interval for all N63 vehicles. BMW had long emphasized the fact that its vehicles can go long periods without service and sold many N63 vehicles with the promise of a two-year or 15,000 mile service interval.  This feature ended with the Customer Care Package, which reduced the service interval to every one year or 10,000 miles.

55.     *Third*, BMW simultaneously launched the "N63 Customer Loyalty Offer" which offered purchasers discounts on new BMW vehicles to replace their defective N63 vehicles.

56.     *Fourth*, BMW also launched a related "N63 Customer Appreciation Program", which authorized dealerships to provide purchasers with up to $50 of BMW merchandise or accessories.

## The Battery Defect

57.    The N63 engine also causes BMW vehicles to suffer a Battery Defect.  This defect forces N63 vehicles' batteries to rapidly deteriorate and require replacement every 10,000 to 20,000 miles.  N63 purchasers did not bargain to replace their luxury vehicles' expensive batteries this frequently.

58.    One BMW enthusiast described the Battery Defect in a June 2015 Road & Track article, *Enginerdy: Why BMW's N63 twin-turbo V8 eats batteries: When cars get complicated, weird things happen. In the search for fuel economy and prodigious output, BMW's N63 twin-turbo V8 happens to chew through batteries*.  In the article, the author explains that BMW's standard battery configuration worked for most American consumers until it was used with the N63 engine.  This is because the twin turbochargers are located inside the engine V on the N63.  This causes additional heat accumulation, which requires the engine fan to run long after these vehicles have been turned off.  This in turn stresses the battery, which quickly fail and need frequent replacement. (http://www.roadandtrack.com/car-culture/buying-maintenance/a25710/enginerdy-strange-connections-bmw-n63-v8/).

59.    This article was posted in a BMW-aficionado thread, *R&T: BMW's N63 Motor (M5, M6, 750i, etc) will need a new battery every 10,000 miles*, where several BMW fans agreed with the article's assessment of the defect.  One N63 owner agreed and expressed his frustration:

> I think they explained the problem perfectly.  **Fans run from anywhere from 10 to 15 minutes AFTER the car is shut off.  How does that NOT drain the battery?**  All due to heat soak in the engine bay, which in turn is due to the placement of the turbos inside the "vee." . . .  **And who do you think is going to pay for that new battery once the warranty is up?  BMW should stop trying to do the "easy" thing and do the "RIGHT thing for their customers**.  Reprogram the charging system so I don't need a new battery every 10K.

(http://www.bimmerfest.com/forums/showthread.php?t=843143).

60.     Another responded to the article in a separate *Detailed report on a major issue with the N63 engine* thread: "Great read.  It's actually atrocious how BMW has handled the entire N63 build.  It's almost like Frankenstein's Monster at this point.  Each and every owner should be able to get new batteries each time a car is brought in for whatever the reason." (http://www.bimmerfest.com/forums/showthread.php?t=843101).

61.     Another owner agreed and posted "BMW is smoking crack if they think I'm pay $500 + for a new battery every oil change – I already get 3-4 oil changes a year on my own nickel.  They should include this up to 100k miles – seems like a bait and switch on the 'everything's covered' maintenance program." (*Id.*).

62.     An enthusiast started a *Good Read for our N63 CCP'd festers* thread regarding the same Road and Track article.  An owner responded, "[t]his type of idiotic design really makes me miss my Lexus." (http://www.bimmerfest.com/forums/showthread.php?t=843077).

63.     Another commenter echoed this sentiment, "This N63 just keeps getting better and better."  (*Id.*).

64.     There are thousands of additional consumer complaints regarding the Battery Defect available on the internet.

**The Battery Defect Bulletin**

65.     In response to widespread frustration with N63 battery failures, BMW issued Technical Service Bulletin SI B61 30 14 (the "Battery Defect Bulletin") in December 2015.  The purpose of this bulletin was to instruct BMW service representatives to replace N63 vehicle batteries at every oil change if the battery had not been replaced in the last 12 months.  This bulletin provides N63 owners with free replacement batteries, but only until the expiration of BMW's 4 year or 50,000 mile Standard Maintenance Program.  When that expires, N63 owners

will be forced to constantly replace batteries at their own expense for the remaining lives of their vehicles.

66.     This service bulletin, with the subject line "BMW Maintenance Program: 12-Volt Battery Replacement Measure" applies to all BMW X5's containing the N63 engine produced from April 2010 until June 2013, including Plaintiff Scott Crockett's vehicle.  The bulletin also applied to some BMW vehicles that did not contain the N63 engine.

67.     The Bulletin went into effect January 1, 2015 and applied to only those vehicles still covered under BMW's Standard Maintenance Program, which provides new vehicle services, at no cost, for 4 years or 50,000 miles.  The Battery Defect Bulletin includes the following explanation of the Battery Defect and the manufacturer's policy to replace N63 batteries at every oil change:

> **Vehicles with an N63 Engine**
> Vehicles with N63 engines require additional cooling capacity, and the activation of various cooling system components places additional demands on the battery. Several enhancements have been made to the power management system on such vehicles.  However, in a quest to ensure total customer satisfaction, please replace the 12-volt battery on a preventative maintenance basis at every engine oil service (engine oil service counter #1, #2, #3, etc.), unless the battery was replaced within the last 12 months.

68.     The Bulletin also recommends that service representatives replace earlier model 90/92 AH batteries (part number 61 21 2 353 812) with newer, more powerful 105 AH batteries (part number 61 21 2 353 814).  This was BMW's attempt to make the vehicles batteries last as long as possible before inevitable failure.

69.     The article referenced above, *Enginerdy: Why BMW's N63 twin-turbo V8 eats batteries*, explains that this is a temporary patch, not a permanent solution to the Battery Defect:

> The simple solution would be to reprogram the engine computers to keep batter's state of charge at a higher level.  But in modern cars, everything affects something else, most often in the most unlikely of ways.  Charging the battery more often

18

would affect fuel economy, which would require BMW to recertify the cars with the EPA. . . . .

**So BMW can't actually fix the battery problem, it can only mask it. . . .**

(http://www.roadandtrack.com/car-culture/buying-maintenance/a25710/enginerdy-strange-connections-bmw-n63-v8/) (emphasis added).

70.     BMW instructed its service representative to code battery replacements under "**Defect Code: 85 10 02 56 MP**."  Upon information and belief, this defect code refers to the Battery Defect and was known by BMW long before January 1, 2015.

71.     N63 owners have been disappointed by BMW's response to the Battery Defect. One frustrated enthusiast posted the following: ". . . .  Are you guys really replacing your batteries every 10k?  Is BMW going to pay for this if that's indeed the new service interval?  It seems like the value of N63 cars would plummet on the second hand market because of this." (http://www.bimmerfest.com/forums/showthread.php?t=843077).

72.     Another consumer agreed, "Holy crap that is sad…..there goes the resale value of these cars!!! Too bad :(" (*Id.*).

## The N63Tü Engine

73.     In response to widespread customer complaints and internal recognition of the original N63's serious defects, BMW quickly designed and released an updated version of the engine, the N63B44O1 (known as the "N63Tü"). [2]

74.     The N63Tü, like the N63, is also a "reverse-flow" design meaning the two turbochargers are positioned in the engine V, instead of outside like most other designs.  The new model also incorporated BMW's Valvetronic variable valve timing technology.  As a result

---

[2] "Tü" stands for "Technische Überholung," which translates to "Technical Revision."

of these and other improvements, the N63Tü was measured at 445 horsepower along with 480 lb-ft of peak torque.

75.     BMW incorporated the new N63Tü engine on some 2013 models that previously contained the N63, but not the 2013 X5, X6 and 5 Series models, including the vehicle purchased by Plaintiff Scott Crocket, which received the known defective N63 engine in the 2013 model year.

### Diminished Resale Value

76.     Besides the frequent breakdowns and repeated service visits, N63 purchasers often complain about the impact these defects will have on the resale value of their vehicles.

77.     One BMW enthusiast was reluctant to purchase an N63 vehicle, even after the N63 Customer Care Package:

> I am looking into a purchase of an out of warranty 2011 550i 6 speed with low miles.  The dealer selling it took it in to the BMW dealer for the customer care [recall].  I have the repair invoice. . . .
>
> The dealer advises [sic] there is no extended warranty on the engine as a consequence of the recall, just a 2 year warranty on the limited work done.  Sad, but I think I'm going to walk away from this deal and continue searching for a CPO car.  **Having a BMW V8 with known problems out of warranty doesn't seem a smart move, even if the car is fine right now.**

(http://www.bimmerfest.com/forums/showthread.php?t=818901) (emphasis added).

78.     A current N63 owner started a thread, *Advice needed, 2011 7 series with n63 engine*, with the following complaint about the overall quality and value of his vehicle:

> Ok, I've had the car 3 years, bought it used from a dealer, 20k miles on it when I bought it, now 98k miles.  Lots of maintenance since I've had it, etc, etc. . . . .
>
> My guy at the repair shop (a BMW Certified Shop but not a BMW dealership) tells me that as soon as I get the car fixed I need to sell it.  **He calls it a "throw away" car, says it's the worst car BMW has ever made.  Says he's seen older**

**model 7 series get 500,000 miles no problem, but these N63 Engines have been a disaster for BMW, and that he wouldn't have one that wasn't under warranty.** Says black smoke out the tail pipe is the next thing I should start seeing.

(http://www.bimmerfest.com/forums/showthread.php?t=824755) (emphasis added).

79.     Another enthusiast responded, "**The consensus is to not to own one out of warranty** . . . ." (*Id.*) (emphasis added).

80.     Another thread, *Considering the (dreaded) 550i / N63*, was started to ask for advice whether to purchase a BMW 5 Series with an N63 engine.  A commenter responded with the following advice:

> Hmm- an unwarrantied first year 550i sounds like quite a gamble. I guess it comes down to how much you want the car and your appetite for risk.  Probably best to mentally prepare yourself for the cost of replacing the engine if it should come to that.  . . .
>
> **And I agree with your assessment- BMW hasn't really fixed the N63 issues (at the core of the various other issue is the location of the turbos causing too much heat).** Although they updated various parts such as injectors to heavier duty specs, I think I good bet that there will still be issues in the future but hopefully at a longer interval.  **Also factor in that BMW now recommends replacing the 550's battery once a year.** Even in a worst case scenario, ,  [sic] its hard to imagine that you'd ever spend the difference in depreciation between a new and used one on repairs.

(http://www.bimmerfest.com/forums/showthread.php?t=854627) (emphasis added).

## BMW'S New Vehicle Warranty

81.     Plaintiff's X5 came with a standard BMW new vehicle warranty, which the company refers to as its "New SAV Limited Warranty."  Upon information and belief, the New SAV Limited Warranty is materially identical to BMW warranties sold on all other N63 vehicles.  Collectively, these practically identical warranties will be referred to as BMW's "New Vehicle Warranty."

82.     The New Vehicle Warranty includes the following terms:

**Warrantor**

BMW of North America, LLC (BMW NA) warrants 2013 U.S.-specification SAVs distributed by BMW NA or sold through the BMW NA European Delivery Program against defects in materials or workmanship to the first retail purchaser, and each subsequent purchaser.

**Warranty Period**

The warranty period is 48 months or 50,000 miles, whichever occurs first.

**Warranty Begins**

Coverage begins on the date of first retail sale or the date the vehicle is first placed into service as a sales demonstrator, Aftersales Mobility Program (AMP) Vehicle or company vehicle, whichever is earlier.

**Warranty Coverage**
To obtain warranty service coverage, the vehicle must be brought, upon discovery of a defect in material or workmanship, to the workshop of any authorized BMW SAV center in the United States or Puerto Rico, during normal business hours. The authorized BMW SAV center will, without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts. The decision to repair or replace said part(s) is solely the prerogative of BMW NA.  Parts for which replacement are made become the property of BMW NA.

In all cases, a reasonable time must be allowed for warranty repairs to be completed after the vehicle is received by the authorized BMW SAV center.

83.    The New Vehicle Warranty does not protect N63 purchasers from the Burning Oil Defect, the Engine Quality Defect, or the Battery Defect because BMW's efforts temporarily mask these conditions instead of providing purchasers with non-defective vehicles as originally warranted.

84.    BMW has attempted to mask the Burning Oil Defect until the expiration of the New Vehicle Warranty by (1) reducing the service interval of N63 vehicles from once every two years or 15,000 miles to once every one year or 10,000 miles; and, (2) instructing service representatives and owners to add more oil to these vehicles.  These measures fail to remedy the

defect because N63 owners are still left with a defective engine that burns oil after the expiration of the Warranty.  As a result, N63 owners are forced to pay for additional oil between service visits, are forced to worry about their vehicles spontaneously needing oil away from an authorized service center, and will be forced to sell their vehicles for less than they originally intended because second-hand purchasers would rather purchase a vehicle without this issue.

85.    BMW has attempted to mask the Engine Quality Defect until the expiration of the New Vehicle Warranty by instituting the N63 Customer Care Program, which instructs service representatives to inspect and replace certain engine components that have already begun to fail. This measure temporarily masks the Engine Quality Defect because owners are still left with defective N63 engines that suffer from fundamental design flaws after the replacement of the least durable engine components.  N63 owners are forced to frequently repair their vehicles and will be forced to sell their luxury vehicles for less than they originally intended.

86.    BMW has attempted to mask the Battery Defect until the expiration of the New Vehicle Warranty by instituting the Battery Defect Bulletin, which provides replacement batteries through the expiration of BMW's 4 year/50,000 mile Standard Maintenance Program. The Battery Defect Bulletin fails as a remedy because owners will be forced to replace their batteries every 10,000 to 20,000 miles for the remaining lives of their vehicles.  This need for frequent, expensive battery replacements will significantly harm the resale value of N63 vehicles.

**Plaintiff Scott Crockett's N63 Vehicle Failures**

87.    Scott Crockett lives in the Village of Loch Lloyd, Cass County, Missouri and purchased a 2013 model X5 SUV containing the N63 engine from Baron BMW in Merriam, Kansas on May 24, 2013.   Crockett's vehicle was sold with BMW's "New SAV Limited

Warranty," which covers the vehicle for 48 months or 50,000 miles along with BMW's Standard Maintenance Program of the same length.  Crockett also purchased BMW's "Extended Vehicle Protection" that covers his vehicle to 72 months or 100,000 miles.

88.     Crockett originally intended to purchase an X5 that contained an inline 6-cylinder engine, but decided to purchase the V8 version containing the N63 because of the model's supposedly superior performance.

89.     Neither BMW nor its authorized dealership told Crockett that his X5 would burn excessive amounts of oil and require additional oil between visits before he purchased the vehicle.  Plaintiff would not have purchased the vehicle if he was aware of the Burning Oil Defect.

90.     Neither BMW nor its authorized dealership told Crockett that his X5 would need its battery replaced at every oil change before he purchased the vehicle.  Plaintiff would not have purchased the vehicle if he was aware of the Battery Defect.

91.     Neither BMW nor its authorized dealership told Crockett that his X5 is likely to suffer from a host of other reliability and mechanical issues before he purchased the vehicle. Plaintiff would not have purchased the vehicle if he was aware of the Engine Quality Defect.

92.     Sometime in spring 2014, Crockett was driving his 10-month-old BMW X5 SUV and received an alert on the vehicle's electronic display that told him his oil was critically low. Crockett became concerned and called Baron BMW, who told him that the vehicle's engine was known for consuming excessive amounts of oil and often needed additional oil between changes. Baron BMW also told Crockett that aggressive driving would specifically cause his vehicle to burn oil.  Shortly thereafter, Crockett took his vehicle to Baron BMW, who added additional oil at no cost to Mr. Crockett.

93.     Crockett again had his oil changed by Baron BMW later in 2014.

94.     In spring 2015, Crockett took his vehicle to Baron BMW for another oil change. After this service visit, BMW's authorized service representative mentioned that he had replaced the SUV's battery free of charge under the Standard Maintenance Plan. Crockett thought it was odd that his brand-new luxury vehicle would need a new battery after only two years and was specifically concerned about the car's resale value after this development.  Neither Baron BMW nor any other BMW representative told Crockett that his vehicle was repaired pursuant to the Battery Defect Bulletin.

95.     In summer 2015, Crockett learned about the N63 Customer Care Package when researching the Burning Oil and Battery Defects online.  He intends to have the N63 Customer Care Package performed on his vehicle in the coming weeks.

96.     As a result of the many problems with the N63 engine and the publicity surrounding those problems, the market or resale value of Crockett's N63-containing BMW X5 has declined significantly, upon information and belief by several thousands of dollars, compared to BMW X5's that are otherwise similarly equipped, in similar condition, and that do not contain the N63 engine.  This decline in value is attributable to BMW's breaches of warranty regarding the N63 engine.

## BMW's Knowledge of the Defects

97.     Upon information and belief, BMW knew or should have known of the Burning Oil, Engine Quality, and Battery Defects long before Plaintiff Scott Crockett purchased his vehicle on May 24, 2013.  BMW had numerous sources of real-time product feedback from which to learn this information:

98.     *First*, BMW knew or should have known about the Defects as a result of its policy of collecting defective parts when replaced by authorized service technicians.  The New Vehicle Warranty includes, "[p]arts for which replacement are made become the property of BMW NA." This provision indicates that BMW of North America, LLC maintains an internal, regimented process to identify defective components as parts are replaced by BMW service representatives. This formal defect identification process is further evidence by the company's reference to "Defect Code: 85 10 02 56 MP" in the Battery Defect Bulletin.

99.     *Second*, BMW should have learned of the Defects from warranty reimbursements to its independent service representatives.  The New Vehicle Warranty instructs N63 owners to take their vehicles to authorized service centers for warranty repairs:

> **Warranty Coverage**
> To obtain warranty service coverage, the vehicle must be brought, upon discovery of a defect in material or workmanship, to the workshop of any authorized BMW SAV center in the United States or Puerto Rico, during normal business hours. . . .

This means BMW had a real-time source of product feedback and notice of product failures as soon as N63 owners started to invoke the New Vehicle Warranty.

100.     *Third*, BMW knew or should have known about the defects from complaints about the N63 made directly to the BMW of North America Customer Relations and Services Department.  Plaintiff Scott Crockett's warranty includes the following instructions if a service center fails to address a customer's complaint:

> Despite the best intentions of all parties, a misunderstanding may occur between you and your BMW SAV center.  Should this occur and you require further assistance, please contact the BMW NA Customer Relations and Services Department at:
>
> Telephone: 1 800 831-1117
>
> Email: customerrelations@bmwusa.com

Website: www.bmwusa.com

This means that BMW had a direct, real-time source of product feedback that was entirely independent of its service representatives.

101.    *Fourth*, BMW knew or should have known about the defects from public comments and complaints from the BMW-enthusiast community.  As a high-performance luxury automotive brand, BMW has attracted a large number of BMW fans who enjoy discussing their BMW vehicle with other enthusiasts.  There are several websites where BMW owners and enthusiasts post comments, and often complaints, about BMW vehicles.  BMW could have learned of the pervasive extent of the defects from this public source of real-time product failure information.

### IV.    CLASS ACTION ALLEGATIONS

#### The Proposed Classes

102.    Plaintiff seeks to bring an action on behalf of himself and all others similarly situated under Federal Rule of Civil Procedure 23.  Plaintiff proposes three potential classes, all three of which he is a member—the Nationwide Class, the Magnuson-Moss Class, and the Kansas Class—defined as follows:

a.    The **Nationwide Class** includes:

All natural persons who purchased or leased a BMW vehicle containing the N63 engine for personal, family, or household use within the United States (including its Territories and the District of Columbia).

b.    The **Magnuson-Moss Class** includes:

All natural persons who purchased or leased a BMW vehicle containing the N63 engine for personal, family, or household use within the states of Alabama, Alaska, Arizona, Colorado, Connecticut, Delaware, Florida, Hawaii, Illinois, Indiana, Kansas, Louisiana, Maine, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South

27

Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming, any United States Territory, or the District of Columbia.[3]

c.     The **Kansas Class** includes:

All natural persons who purchased or leased a BMW vehicle containing the N63 engine for personal, family, or household use within the State of Kansas.

d.     Excluded from all three classes are the following:

The judge to whom this case is assigned and any member of the judge's immediate family, along with Defendant BMW of North America, LLC's employees, officers, directors, agents, and representatives and their immediate family members.

103.    Plaintiff reserves the right to re-define the Nationwide, Magnuson-Moss, and/or Kansas Classes prior to class certification.

## Numerosity

104.    The members of all three proposed Classes are so numerous that joinder of all members is impracticable.

105.    The precise number of Class members is unknown because this information is in the exclusive control of BMW of North America and its affiliated dealerships.

106.    According to one source, there were 124,829 X5 SUVs sold for the 2011, 2012, and 2013 model years.  Some portion of these, the size of which is currently unknown, were manufactured and sold with the defective N63 engine.

107.    The Classes also includes those who purchased N63 engines as part of BMW 5 Series, 6 Series, 7 Series, and X6 vehicles from 2008 until the present.  Upon information and belief, there are tens of thousands of Class members who own a BMW model that meets the Class definitions, including more than 100 members of the Kansas Class, and thousands of members of the Nationwide and Magnuson-Moss Classes.

---

[3] Excluded are those who purchased N63 vehicles in Arkansas, California, Georgia, Idaho, Iowa, Kentucky, Maryland, Massachusetts, Minnesota, Pennsylvania, Ohio, and Virginia.

**Common Questions of Law and Fact**

108.    Several questions of law and fact are common to Plaintiff all three proposed

Classes.   These questions predominate over individualized inquiries.   These legal and factual

questions include, but are not limited to:

b.    Whether N63 vehicles are defective because they frequently burn, leak, and otherwise consume excessive amounts of oil;

c.    Whether N63 vehicles are defective because they require an excessive number of battery replacements;

d.    Whether N63 vehicles are defective because they are unreliable and in need of frequent repair;

e.    Whether the N63 engine was defectively designed and/or manufactured;

f.    Whether BMW knew or should have known N63 vehicles were defective before they were first sold to consumers;

g.    Whether BMW knew or should have known N63 vehicles were defective shortly after they were first sold to consumers;

h.    Whether BMW knew or should have known N63 vehicles were defective before the engine was included on 2013 model vehicles;

i.    Whether BMW misrepresented or omitted material information regarding the quality and/or reliability of N63 vehicles;

j.    Whether N63 vehicles have conformed to reasonable buyers' expectations;

k.    Whether BMW had a duty to inform N63 vehicle purchasers about the Burning Oil Defect prior to sale;

l.    Whether BMW had a duty to inform N63 vehicle purchasers about the Battery Defect prior to sale;

m.    Whether BMW had a duty to inform N63 vehicle purchasers about the Engine Quality Defect prior to sale;

n.    Whether BMW misrepresented or intentionally omitted material information when selling N63 vehicles;

o.   Whether BMW breached the implied warranty of merchantability with respect to N63 vehicles;

p.   Whether BMW breached the New Vehicle Warranty by refusing or failing to remedy N63 vehicles;

q.   Whether Plaintiff and Class members are entitled to compensatory, exemplary, statutory, or punitive damages and the amount of any such damages;

r.   Whether BMW should be declared financially responsible for notifying Class members about the defective nature of N63 vehicles and for all damages to Class members as a result.

**Typicality**

109.   Plaintiff's claims are typical of all Class members.  Plaintiff and all Class members have suffered similar damages as a result of purchasing N63 vehicles that were assembled, marketed, distributed, and sold by Defendant BMW.

**Adequacy of Representation**

110.   Plaintiff will fully and adequately represent and protect the interests of the Classes because he shares common injuries and common interests with Class members as a result of BMW's conduct that was equally applicable across the Classes.

111.   Plaintiff has retained counsel with substantial experience handling complex litigation in federal courts, including prosecuting numerous class actions.  Plaintiff and his counsel are committed to vigorously prosecuting this suit on behalf of the Class and have the financial resources necessary to do so.

112.   Neither Plaintiff nor his counsel have any interests that are contrary to those of the Classes they seek to represent.

**Superiority**

113. The class action is superior to all other methods of resolving this litigation in a fair and efficient manner. Plaintiff is unaware of any difficulties that would prevent prosecution of this litigation as a class action.

114. If this action were tried individually by Class members, it would create the risk of inconsistent and varying adjudications concerning the subject of this action.

115. Absent a class action, the majority of Class members would be financially unable to litigate these claims individually and would be denied an adequate remedy for BMW's actions that have caused them significant harm.

116. Class treatment of common questions of law or fact is superior to individual adjudications because it will conserve limited judicial resources and allow for efficient adjudication of the present controversy.

## Tolling of Limitations Periods

117. All limitations periods of the claims presented herein were tolled by the doctrines of fraudulent concealment, the discovery rule, and/or equitable tolling. As alleged herein, BMW wrongfully concealed the Burning Oil, Engine Quality, and Battery Defects and its dealerships made inadequate repairs incapable of fixing the root cause of the Class vehicles' malfunctions. Plaintiff and the Class Members did not discover the operative facts that are the basis of their claims because those facts have been concealed by BMW.

## COUNT I

### Violation of Magnuson-Moss Warranty Act

118. Plaintiff incorporates by reference all allegations contained in this Complaint as though fully set forth herein.

119.    Plaintiff brings Count I on behalf of himself and on behalf of the Magnuson-Moss Class, or, in the alternative, on behalf of the Kansas Class.

120.    Plaintiff and other Class Members are "consumers" who purchased "consumer products" for purposes of 15 U.S.C. § 2301(1) and (3) because they purchased N63 vehicles for personal, family, or household purposes and are entitled to invoke the New Vehicle Warranty.

121.    BMW is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5) because the company regularly sells BMW vehicles accompanied by the written New Vehicle Warranties.

122.    The amount in controversy of the Plaintiffs' individual claims meet or exceeds $25.00 in value.  In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

123.    BMW violated the Magnuson-Moss Warranty Act when it failed to honor its written warranty obligations in the New Vehicle Warranty by delivering N63 vehicles that suffered from the Burning Oil, Engine Quality, and Battery Defects as described in detail above.

124.    BMW specifically warranted its vehicles "against defects in materials or workmanship" at the time of retail sale and for an additional "48 months or 50,000 miles." BMW extended this warranty "to the first retail purchaser, and each subsequent purchaser" for the duration of the warranty.

125.    The terms of BMW's written New Vehicle Warranty became part of the basis of the bargain between Plaintiff and all other Class Members when deciding to purchase an N63 vehicle.

126.    BMW breached its written warranty with respect to N63 vehicles: (1) Each time it sold N63 vehicles in a defective state to first retail purchasers; (2) Each time its authorized

service representatives failed to properly repair, replace, or adjust malfunctioning N63 vehicles to a non-defective state; and (3) Each time it failed to authorize its service representatives to perform adequate repairs on N63 vehicles and instead instructed its representatives to perform temporary, inadequate repairs to mask the underlying defects until after the expiration of the New Vehicle Warranty.

127.     BMW also extended an implied warranty of merchantability on N63 vehicles at the time of sale and for the first 48 months or 50,000 miles.

128.     BMW breached the implied warranty of merchantability when it sold N63 vehicles to consumers that suffered from the Burning Oil, Engine Quality, and Battery Defects when they left BMW's control.  Plaintiff and Class Members used their N63 vehicles for the ordinary purpose that consumer automobiles are used—to reliably, comfortably, and safely transport passengers and belongings for personal, family, or household purposes.  Despite Plaintiff and Class Member ordinary and expected use of their vehicles, N63 vehicles have not lived up to minimal consumer expectations. As a result, BMW breached the implied warranty of merchantability when it sold N63 vehicles that were not of fair average quality and would not pass without objection in the luxury consumer automotive industry at the time of sale.

129.     BMW has been given a reasonable opportunity to cure its breach of the New Vehicle Warranty and implied warranty of merchantability and/or Plaintiff and Class members were not required to do so because such an opportunity would be futile.  BMW has known about the Burning Oil, Engine Quality, and Battery Defects from customer complaints, service information, and warranty data and has failed to repair or replace N63 vehicles as originally warranted.

130.    As a direct and proximate result of BMW's breach of the New Vehicle Warranty and the implied warranty of merchantability, Plaintiff and Class Members have suffered damages in an amount to be determined at trial.

131.    Plaintiff, individually and on behalf of the Magnuson-Moss or Kansas Classes, seeks all damages permitted by law, including compensation for the monetary difference between N63 vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred due to N63 vehicle breakdowns; the cost of purchasing, leasing, or renting replacement vehicles, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

## COUNT II

### Breach of Express Warranty

132.    Plaintiff incorporates by reference all allegations contained in this Complaint as though fully set forth herein.

133.    Plaintiff brings Count II on behalf of himself and on behalf of the Nationwide Class, or in the alternative, on behalf of the Kansas Class.

134.    BMW assembled and sold N63 vehicles into the stream of commerce with the intent they be purchased by Plaintiff and Class Members.

135.    In the New Vehicle Warranty, BMW expressly warranted N63 vehicles "against defects in materials or workmanship" when first sold to retail purchasers.

136.    BMW also expressly warranted that it would repair or replace defective vehicles, at no cost to the owner, if it receives notice of vehicle defects within the first 48 months or 50,000 miles after the first retail sale.

137.     The terms of BMW's New Vehicle Warranty became part of the basis of the bargain between Plaintiff and all other Class Members when deciding to purchase an N63 vehicle.

138.     Plaintiff and Class Members, including second-hand owners who did not purchase N63 vehicles from BMW authorized dealerships, are express, intended third-party beneficiaries of BMW's New Vehicle Warranty because it explicitly extends to "the first retail purchaser, and each subsequent purchaser."

139.     BMW breached its New Vehicle Warranty with respect to N63 vehicles: (1) Each time it sold N63 vehicles in a defective state to first retail purchasers; (2) Each time its authorized service representatives failed to properly repair, replace, or adjust malfunctioning N63 vehicles to a non-defective state; and (3) Each time it failed to authorize its service representatives to perform adequate repairs on N63 vehicles and instead instructed its representatives to perform temporary, inadequate repairs to mask the underlying defects until after the expiration of the New Vehicle Warranty.

140.     As a result of the Burning Oil, Engine Quality, and Battery Defects, N63 vehicles were defective and did not adhere to the New Vehicle Warranty when first sold and have not been remedied as originally warranted since the time of sale.

141.     By breaching its express warranty, BMW has caused and continues to cause these warranties to fail of their essential purpose.

142.     BMW has been given a reasonable opportunity to cure its breach of the New Vehicle Warranty and/or Plaintiff and Class Members were not required to do so because such an opportunity would be futile.  BMW has known about the Burning Oil, Engine Quality, and

Battery Defects from customer complaints, service information, and warranty data and has failed to repair or replace N63 vehicles as originally warranted.

143.    As a direct and proximate result of BMW's breach of the New Vehicle Warranty, Plaintiff and Class Members have suffered damages in an amount to be determined at trial.

144.    Plaintiff, individually and on behalf of the Nationwide or Kansas Classes, seeks all damages permitted by law, including compensation for the monetary difference between N63 vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred due to N63 vehicle breakdowns; the cost of purchasing, leasing, or renting replacement vehicles; along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

## COUNT III

### Breach of Implied Warranty of Merchantability

145.    Plaintiff incorporates by reference all allegations contained in this Complaint as though fully set forth herein.

146.    Plaintiff brings Count III on behalf of himself and on behalf of the Nationwide Class, or in the alternative, on behalf of the Kansas Class.

147.    BMW marketed and sold N63 vehicles into the stream of commerce with the intent they be purchased by Plaintiff and Class Members.

148.    BMW is a "merchant" for purposes of the Uniform Commercial Code because the company regularly sells consumer automobiles of this kind.

149.    As a result of the Burning Oil, Engine Quality, and Battery Defects, N63 vehicles were defective and not of merchantable quality when they left BMW's control.  Plaintiff and Class Members used their N63 vehicles for the ordinary purpose that consumer automobiles are

used—to reliably, comfortably, and safely transport passengers and belongings for personal, family, or household purposes.  Despite Plaintiff and Class Member ordinary and expected use of their vehicles, BMWs containing the N63 did not adhere to minimal consumer expectations, were not of fair and average quality, and would not pass without objection in the luxury consumer automotive industry at the time of sale.

150.   As recognized in the New Vehicle Warranty, BMW also extended an implied warranty of merchantability over class vehicles for 48 months or 50,000 miles.  BMW breached this warranty of future performance with respect to N63 vehicles: (1) Each time its authorized service representatives failed to properly repair, replace, or adjust malfunctioning N63 vehicles to a minimally passable state; and (2) Each time it failed to authorize its service representatives to perform adequate repairs on N63 vehicles and instead instructed its representatives to perform temporary, inadequate repairs to the underlying defects mask defects until the expiration of the implied warranty of merchantability.

151.   BMW has been given a reasonable opportunity to cure its breach of the implied warranty of merchantability and/or Plaintiff and Class Members were not required to do so because such an opportunity would be futile.  BMW has known about the Burning Oil, Engine Quality, and Battery Defects from customer complaints, service information, and warranty data and has failed to repair or replace N63 vehicles to a minimum standard of quality.

152.   As a direct and proximate result of BMW's breach of the implied warranty of merchantability, Plaintiff and Class Members have suffered damages in an amount to be determined at trial.

153.   Plaintiff, individually and on behalf of the Nationwide or Kansas Classes, seeks all damages permitted by law, including compensation for the monetary difference between N63

vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred due to N63 vehicle breakdowns; the cost of purchasing, leasing, or renting replacement vehicles; along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

## COUNT IV

### Violation of the Kansas Consumer Protection Act

154.    Plaintiff incorporates by reference all allegations contained in this Complaint as though fully set forth herein.

155.    Plaintiff brings Count IV on behalf of himself and on behalf of the Kansas Class.

156.    Plaintiff and Class Members are "consumers" under K.S.A. § 50-624(b) who engaged in a "consumer transaction" under § 50-624(c) when purchased N63 vehicles.

157.    BMW is a "supplier" under K.S.A. § 50-624(l) because it sells and distributes consumer automobiles in the ordinary course of business.

158.    BMW willfully failed to state, concealed, suppressed, and omitted the fact that N63 vehicles suffer from the Burning Oil, the Quality, and the Battery Defects before selling these vehicles to Plaintiff and Class Members in violation of K.S.A. § 50-626.

159.    These defects were material because an ordinary purchase would attach importance to these defects when deciding whether to purchase a N63 vehicle or another, similar model from BMW or another luxury automotive manufacturer.

160.    BMW sold and leased N63 vehicles with full knowledge they suffered from the Burning Oil, Engine Quality, and Battery Defects.

161.  Even if BMW did not know the details of these defects, BMW had reason to know due to its actual, superior, and specialized knowledge of the N63 engine and N63 vehicles and took advantage of Plaintiff and Class Members ignorance.

162.  BMW continues to willfully conceal, suppress, and omit the material fact that N63 vehicles contain a defective engine, which deprives Plaintiff and the Class Members of covered warranty repairs and/or replacements of defective components.

163.  BMW misrepresented to Plaintiff and Class Members that a purchase or lease of an N63 vehicle entitled the consumer to certain rights and remedies, including a promise to repair all vehicles to a non-defective state at no cost to the owner, when BMW did not intend to honor such rights and remedies.  These misrepresentations had the tendency to mislead a reasonable consumer.

164.  BMW's failure to fulfill obligations, rights and remedies that supposedly accompanied the purchase or lease of N63 vehicles deprived Plaintiff and the Kansas Class of a material benefit of the transaction, which constitutes an unconscionable act or practice under K.S.A. § 50-627.

165.  No reasonable consumer would not have purchased or leased an N63 vehicle if she had known about the serious defects and BMW's intention not to honor its warranty obligations.

166.  As a direct and proximate result of BMW's failure to disclose and suppression of material defects, and BMW's failure to adhere to its New Vehicle Warranty and the implied warranty of merchantability, Plaintiff and Class Members sustained damages and other losses in an amount to be determined at trial.

167.    Plaintiff, individually and on behalf of the Kansas Class, seeks all damages permitted by law, including compensation for the monetary difference between N63 vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred due to N63 vehicle breakdowns; the cost of purchasing, leasing, or renting replacement vehicles; along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this case be certified and maintained as a class action pursuant to one or more of the proposed Classes, as they may be modified or amended, and respectfully requests this Court:

a.    Award damages, including compensatory and exemplary damages to Plaintiff and all Class Members;

b.    Award Plaintiffs and Class Members actual damages sustained;

c.    Grant restitution to Plaintiffs and Class Members and require BMW of North America, LLC to disgorge inequitable gains;

d.    Award Plaintiff and Class Members punitive damages;

e.    Aware Plaintiff and Class Members their reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

f.    Award such other relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City as the place of trial of this action.

Dated:          September 14, 2015.          Respectfully submitted,


                                    /s/ Eric D. Barton
                                    Eric D. Barton (KS # 16503)
                                    Tyler W. Hudson  (KS # 20293)
                                    David P. Barclay (MO # 67256; D. Kan. # 78581 )
                                    **WAGSTAFF & CARTMELL LLP**
                                    4740 Grand Avenue, Ste. 300
                                    Kansas City, Missouri 64112
                                    Telephone: (816) 701-1100
                                    Facsimile:  (816) 531-2372
                                    ebarton@wagstaffcartmell.com
                                    thudson@wagstaffcartmell.com
                                    dbarclay@wagstaffcartmell.com